# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:09-CR-125 |
| | ) | |
| ANTHONY JEROME BANDY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on the Motion to Suppress Evidence as a Result of an Illegal Stop of the Defendant by Gary Police Officers (DE #15), filed by Defendant on August 31, 2009. For the reasons set forth below, the motion is **DENIED**.

BACKGROUND

Defendant, Anthony Jerome Bandy ("Bandy"), is charged with possession of a firearm in violation of 18 U.S.C. 922(g)(1). Bandy has moved to suppress all evidence obtained in violation of the Fourth Amendment. Bandy claims that his stop and arrest were without lawful authority.

This Court held an evidentiary hearing on this matter on September 24, 2009, at which four witnesses testified: (1) Daniel Callahan ("Cpl. Callahan"), a Corporal with the Gary Police

Department, (2) Nicolas Deem ("Officer Deem"), a Patrol Officer with the Gary Police Department, (3) Appolon Beaudouin, Jr. ("SI Beaudouin"), a Staff Investigator with the Federal Community Defender's Office, and (4) Roger Crafton ("Agent Crafton"), a Special Agent with the bureau of Alcohol Tobacco and Firearms ("ATF").

At the conclusion of the hearing, the Court took the instant motion under advisement and ordered additional briefing. In making the following findings of fact, the Court considered the evidence presented and the credibility of the witnesses.[1]

FINDINGS OF FACT

The Court has considered the evidence presented during the hearing as well as the credibility of Cpl. Callahan, Officer Deem, SI Beaudouin, and Agent Crafton. Therefore, the Court finds as follows:

On June 14, 2009, at approximately 1:20 AM, Cpl. Callahan and Officer Deem were on patrol in a fully marked squad car in the Baker sector of Gary, Indiana.[2] Officer Deem was driving the squad car, and Cpl. Callahan was sitting in the passenger seat. Near the

---

[1] In making these findings, the Court also relied on the audio tape from the suppression hearing and the exhibits entered into evidence.

[2] The Baker section is located on the City of Gary's west side. Testimony established that the Baker section extends from the north at 5th Avenue near the steel mills, to the South at 25th Avenue near Interstate 94, to the west at Chase Street, and to the east at Interstate 65.

1700 block of Cleveland Street, a man waved down the squad car. No one else was in the area on foot at that time. Officer Deem stopped the car so that Cpl. Callahan could speak with the individual. The man, a black male wearing a blue shirt, told Cpl. Callahan that there was a "guy on a bike" with a gun in the alley by Hayes Street. The tipster did not provide Cpl. Callahan with the race, age, weight, height, or other specific personal identifiers of the "guy" in the alley. Cpl. Callahan asked the individual for his name, but he declined to give it, saying that he "did not want to be involved anymore." Cpl. Callahan's face-to-face encounter with the individual lasted for a few minutes, and Cpl. Callahan was able to determine that the individual looked clean, spoke clearly, and did not appear to be under the influence of drugs or alcohol. Based on this interaction, Cpl. Callahan found the individual to be credible, and Officer Deem and Cpl. Callahan proceeded to investigate the tip.

After driving for a few minutes, approximately three blocks away they spotted a man on a bike in an alley near the 1700 block of Hayes Street. Prior to that time, neither Officer Deem nor Cpl. Callahan observed anyone else on foot or on a bike in the area.

The man on the bike, later identified as Bandy, was speaking with an individual in an SUV; neither man was engaged in any obvious illegal activity when the squad car pulled up. As the officers approached, Bandy got off the bike and stood with his hand

in his pocket.  The officers got out of the car, and Officer Deem approached the individual in the SUV.  While approaching Bandy, Cpl. Callahan asked him to take his right hand out of his pocket, and Bandy complied.  However, Bandy then began backing up with the bike.  While Bandy asserts that Cpl. Callahan "grabbed" his shirt at this point before he broke off and began to flee, Cpl. Callahan testified credibly that he believed Bandy was going shove the bike at him in order to flee; therefore, as he walked towards Bandy, he told him "you don't want to do this."  Cpl. Callahan then testified that when he was a few steps away, Bandy shoved the bike away from him and sprinted away.  Officer Deem also testified that he heard Cpl. Callahan caution Bandy before he heard the bike hit the ground.  He then turned to see Bandy fleeing towards the alley. Both officers testified that they had neither pulled their guns out of their holders nor touched Bandy in any way while in the alley.

Officer Deem focused on the individual in the SUV while Cpl. Callahan began to pursue Bandy.  Officer Deem asked the man in the SUV to step out of the vehicle and come with him until they could figure out what was going on.  The individual complied, and Officer Deem placed him in the backseat of the squad car.  Officer Deem did not ask for the individual's identification or pat him down prior to putting him in the car.  When asked upon cross-examination why he did not do so, Officer Deem testified that he knew it would be "unconstitutional."

As Bandy fled, Cpl. Callahan identified himself as a police officer and ordered Bandy to "stop" several times. Bandy continued to flee. Cpl. Callahan chased Bandy through alleys, backyards, and over fences. He finally caught up with him after Bandy fell over a fence and landed in a front yard near 1700 Arthur Street. Cpl. Callahan ordered Bandy to place his hands in front of him so he could handcuff him behind his back, but Bandy refused and continued to struggle. At some point during the struggle, Cpl. Callahan was able to handcuff Bandy's hands in front of him.

He radioed for back-up, and when several officers, including Officer Deem, arrived, Cpl. Callahan asked them to cuff Bandy's hands behind his back while he walked through the area to determine if Bandy had thrown any contraband to the ground during the flight and chase. Officer Deem struggled with Bandy and eventually ended up spraying him with mace before securing his hands behind his back. Officer Deem conducted a pat-down of Bandy while he was on the ground; he did not discover any weapons, but he testified that Bandy's position on the ground as well as his struggling contributed to the difficulty of conducting a thorough pat-down. Bandy was placed under arrest for resisting law enforcement.

Upon arrival at the Gary Police Station, Bandy asked to use the restroom several times, but when he was informed that he could only do so if accompanied by Cpl. Callahan, he changed his mind. Cpl. Callahan testified that Bandy was acting strangely and kept

leaning to the right side in his chair.  At that point, Cpl. Callahan decided to conduct another outer clothing pat-down and inventory search.  Cpl. Callahan reached into Bandy's pocket and did not initially feel anything abnormal.  However, when he pushed deeper into the pocket, he discovered a loaded firearm.  Following this discovery, Officer Deem ran a criminal history on Bandy, and the report indicated that Bandy had been previously convicted of a felony and had a warrant out for his arrest stemming from a parole violation in Georgia.

On June 15, 2009, the day after Bandy's arrest, an interview of Bandy was conducted by Agent Crafton and Task Force Agent Arlington.[3]  The interview lasted approximately thirty minutes, and the manner in which Cpl. Callahan and Officer Deem approached Bandy was discussed.  When first asked about the approach, Bandy described how he was on a bike, talking to a friend in a car, when the police pulled up.  He did not mention the police grabbing him, but he did state that, to "be honest, I ran because I knew I had a gun on me."  Later in the interview, Bandy stated that the officer never told him to simply take his hand out of his pocket but rather immediately grabbed his bike and shirt.  Bandy stated that he realized he was drunk, tipsy, and had a gun in his pocket, so he started running.  During the last relevant portion of the

---

[3]  The interview was videotaped.  The entire interview has been entered into evidence as Government Exhibit 4, and an edited version of the video has been entered into evidence as Defendant's Exhibit (A).

interview related to the initial interaction between the officers and Bandy, he reiterated that the officer "grabbed" him before he fled. During the interview, Bandy told Agent Crafton numerous times that he had been drinking heavily on the night of his arrest. Bandy admitted that he had consumed two "fifths" of Patron tequila and a twelve pack of beer.

In reference to the area of Gary, Indiana in which these events took place, both officers testified that it was high crime. Although Cpl. Callahan could not identify any specific arrests or specific crimes that had occurred in the area of the 1700 block of Hayes Street in the recent past, he testified that, in his opinion, the area was considered "high crime." This opinion was based on his thirteen years of experience working for the violent crimes unit in Gary, prior patrols, and knowledge of other investigations that were conducted in the area. Cpl. Callahan testified that he knew of narcotics sales, homicides, shots fired, and loitering issues within the surrounding blocks. While Officer Deem could not recall making any specific arrests, he testified that he had been dispatched to the area on prior occasions for shots fired, suspicious vehicles, and suspicious people. During the videotaped interview the day following his arrest, Bandy himself admitted that two homes in the area, including his "buddy Mikey's" home, were raided by the police for suspected drug activities.

CONCLUSIONS OF LAW

The Fourth Amendment protects persons from unreasonable searches and seizures, and this protection has been extended to the states through the Fourteenth Amendment to the United States Constitution. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961); U.S. Const. Amend. IV. The Fourth Amendment prohibits a warrantless search, unless the search falls under one of the recognized exceptions to the warrant requirement. *U.S. v. Denney*, 771 F.2d 318, 320 (7th Cir. 1985). If a search is conducted without a warrant, the Government bears the burden to prove that an exception to the warrant requirement existed at the time of the search. *U.S. v. Rivera*, 248 F.3d 677, 680 (7th Cir. 2001). The Government argues that reasonable suspicion existed for a *Terry* Stop of Bandy, that probable cause existed for Bandy's arrest for resisting law enforcement, and that the firearm is ultimately admissible under the "Inevitable Discovery Doctrine" because of Bandy's outstanding arrest warrant.

Reasonable Suspicion to conduct a *Terry* Stop of Bandy

The Government first argues that the officers had reasonable suspicion to conduct an investigatory stop of Bandy for further investigation under *Terry v. Ohio,* 392 U.S. 1 (1968)*.* Probable cause is not necessary for police to conduct an investigatory stop, limited in scope and executed by reasonable means. *Terry*, 392 U.S.

at 18-20.  To make an investigatory stop, an officer needs only reasonable suspicion supported by articulable facts that criminal activity is afoot.  *Id.; U.S. v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002).  Reasonable suspicion is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."  *Jackson*, 300 F.3d at 745 (*quoting U.S. v. Cortez*, 449 U.S. 411, 417 (1981)).  The Seventh Circuit has described reasonable suspicion as "less than probable cause but more than a hunch."  *U.S. v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006).

When evaluating whether reasonable suspicion exists, Courts use an objective test and must look to the "totality of the circumstances" in each particular case.  *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002).  "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  *Id*. (*citing U.S. v. Cortez*, 449 U.S. 411, 418 (1981)).  It is important that this inquiry must be "undertaken with due regard to common sense and practicality."  *U.S. v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006) (*citing Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

In some cases, such as this one, critical components of a *Terry* analysis involve the timing and circumstances of the actual seizure.  "[P]olice can be said to have seized an individual 'only if, in view of all of the circumstances surrounding the incident,

a reasonable person would have believed that he was not free to leave.'" *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (*quoting U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980)). A consensual police-citizen questioning or encounter does not necessarily trigger Fourth Amendment protections. *U.S. v. Tyler*, 512 F.3d 405, 409 (7th Cir. 2008) (*citing U.S. v. Drayton*, 536 U.S. 194, 200-01 (2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."); *see also U.S. v. Childs*, 277 F.3d 947, 950 (7th Cir. 2002) ("[T]he Supreme Court has held repeatedly that police may approach persons and ask questions or seek their permission to search, provided that the officers do not imply that answers or consent are obligatory.")

A court must look to the facts of each specific case to determine whether and/or when a seizure has occurred. *Tyler*, 512 F.3d at 410.

> In determining whether a stop is consensual, relevant factors include whether the encounter took place in public, whether the suspect consented to speak to police, whether the officers told the suspect that he was not under arrest and free to leave, whether the suspect was moved to another area, the number of officers present and whether they displayed weapons or physical force.

*U.S. v. Adamson*, 441 F.3d 513, 520 (7th Cir. 2006) (*citing U.S. v. Robinson*, 30 F.3d 774, 782 (7th Cir. 1994)). In *Adamson*, a

probation officer began questioning the defendant and several other individuals outside of a motel exit after finding drug residue in a nearby motel room. *Id*. at 516. The officer asked the individuals to "stand by" until backup arrived and the situation could be resolved. *Id*. The court held that no seizure had occurred up until that point because "a reasonable person under the circumstances set forth in this record would have felt free to leave." *Id*.

Here, the Government contends that Bandy was not seized until Cpl. Callahan came into physical contact with him in front of the residence on Arthur Street following his flight. (DE #25, p. 17.) The Government asserts that any interaction prior to that was a consensual encounter between Bandy and the police. Bandy, on the other hand, argues that he was seized when the officers physically "grabbed" him prior to his flight, or that, in the alternative, he was immediately seized when the officers "exited their vehicle and ordered Mr. Bandy to remove his hand from his pocket." (DE #28, p. 10.) Neither of Bandy's arguments are persuasive, and the Court finds that no seizure occurred until after Bandy fled from the officers.

In making this finding, the Court has reviewed the parties' briefs, the testimony from the suppression hearing, and the full-length videotaped interview of Bandy. The Court finds the testimony of Cpl. Callahan and Officer Deem entirely credible.

-11-

Cpl. Callahan testified that, after exiting the squad car, he walked over to Bandy and asked him to take his hand out of his pocket. Cpl. Callahan testified that he was "just going to ask him what he was doing in the alley." Bandy complied, but then started backing up a little bit with the bike, and Cpl. Callahan, worried that Bandy was going to shove the bike at him and/or flee, told him that he "didn't want to do this." Bandy then fled. Officer Deem's testimony supports this version of events.

There is no indication that either officer brandished his firearm when approaching Bandy. Cpl. Callahan and Officer Deem both testified credibly that their weapons remained in their holsters during the entire initial interaction. The Court finds it interesting that, in his Motion to Suppress, Bandy asserts that the officers "jumped out of their squad cars and drew their weapons." (DE #15, p. 2.) However, in the suppression hearing, during the videotaped interview, and in his post-hearing briefs, Bandy simply states that the officers "grabbed his shirt" before he fled. (DE #24, pp. 4, 8 & DE #28, p. 3.) He fails to mention that the officers drew their weapons, and, as such, the Court does not find Bandy's sole assertion in his initial Motion to Suppress brief credible.

Additionally, the Court does not find Bandy's statement that Cpl. Callahan "grabbed his shirt" before he fled credible. As the Government points out, Bandy did not initially mention this fact in his interview with Agent Crafton. More importantly, during this

interview, Bandy repeatedly admitted that he was very drunk on the night in question. It is reasonable to conclude that Bandy's recollection of events in the alley is questionable or skewed. Although Bandy suggests that he should be believed because he was not drunk during the interview the following day, this assertion does nothing to dispel the credibility problems stemming from his intoxication on the night in question. The Court finds the officers' testimony that they did not grab Bandy in the alley credible. This is bolstered by the fact that the officers' respective testimony corroborates each other and by the fact that Officer Deem specifically testified upon cross-examination that, after Bandy fled, he did not pat down the driver of the SUV because he knew it would be "unconstitutional." The Court agrees with the Government that this is indicative of proper training and diligence when dealing with individuals on the street. Bandy's argument that the officers should not be believed because they "had plenty of time to meet with each other and the prosecutors before [they gave] their testimony" while Bandy gave his statement to Agent Crafton less than 48 hours after his arrest, is unpersuasive. (DE #28, p. 4.)

Finally, the Court does not agree with Bandy's assertion that he was "seized" when the officers "stepped out of their squad car, approached the defendant and [the] driver of the SUV, and instructed the defendant to remove his hand from his pocket." (DE #28, p. 4.) Applying the factors set forth above to the specific

-13-

facts of this case, the Court finds that the encounter in the alley was consensual. Cpl. Callahan asked Bandy to take his hand out of his pocket, and he complied. There is no indication in the record that this was ordered through a show of force or otherwise. Cpl. Callahan's request was reasonable considering the encounter took place in a dark alley, late at night. Bandy's response – removing his hand from his pocket – was reasonable as well. Furthermore, the initial encounter between Bandy and police took place in public, he was not transported from one location to another, he was never asked to surrender his identification, he was never informed that he was suspected of committing a crime, and he was not informed that he was under arrest or unable to leave. All of this information is undisputed. In view of all of the circumstances surrounding the incident, the Court concludes that a reasonable person in the same situation would have believed that he was free to leave, and, thus, a seizure did not take place in the alley.

However, the encounter soon progressed, and a seizure took place in front of a residence on Arthur Street following Bandy's flight and subsequent capture. Looking at the totality of the circumstances, the Court concludes that the *Terry* stop of Bandy was proper at that point because the officers had reasonable suspicion that criminal activity was afoot.

First, the officers had just received a tip from a bystander that there was a man on a bike in the alley by Hayes Street with a gun. The bystander had flagged the officers down and, while he

refused to give his name, he put some of his anonymity at risk by speaking with the police face to face. Cpl. Callahan conversed with the individual for a few minutes and was able to judge his reliability and credibility. He determined the bystander looked clean, spoke clearly, and did not appear to be under the influence of drugs or alcohol. As they were only a few blocks away from Hayes Street, Cpl. Callahan made the decision to investigate the tip. Upon doing so, the officers spotted a man on a bike in an alley on Hayes Street within a few minutes. They did not see anyone else on foot or on a bike prior to that time. The tip proved to be correct, and, as such, should be considered when evaluating whether reasonable suspicion existed.

The Court, however, does agree with Bandy that an anonymous tip stating a person is carrying a gun is, without more, insufficient to justify a seizure of that person. *See Florida v. J.L.*, 529 U.S. 266, 268 (2000). Here, Bandy makes much of the lack of specific personal identifiers provided by the bystander and the inherent unreliability of an anonymous tipster. He also claims that the location the tipster provided was not specific enough to justify a *Terry* stop. While the Court recognizes that this tip standing alone lacked the "moderate indicia of reliability," *Id*. at 271, necessary to justify a proper investigatory detention, the tip is simply one factor the Court has considered in conjunction with the elements described below. When viewing the complete picture, it is clear that the tip was relevant in adding to the reasonable

suspicion surrounding Bandy's seizure.

Next, the fact that events took place in what the officers knew to be a "high crime area" is significant to the Court's analysis and conclusion that reasonable suspicion existed at the time of Bandy's seizure. Bandy argues that the Government provided no "statistical information" or other "evidence to support [the] contention" that the area was considered "high crime." (DE #28, p. 2.) However, both officers testified that they were familiar with the location and that, in their experience as police officers working in Gary, Indiana, the area near the 1700 block of Hayes Street had a reputation for narcotics trafficking, firearm violations, homicides, suspicious vehicles, and suspicious people. In fact, Bandy himself admitted during the videotaped interview that he knew of two homes in the area that had been raided by police for suspected drug activity. Contrary to Bandy's assertion that the Court should disregard the officers' testimony because of a lack of statistical data, the Court can find no mandate by the Seventh Circuit requiring that such information must be provided. *See U.S. v. Baskin*, 401 F.3d 788, 793 (7th Cir 2005) (rejecting defendant's argument that the Government must produce "specific data" to establish that a location is high crime in order to support reasonable suspicion). While Bandy's presence in a high crime area, standing alone, is not sufficient to support a conclusion that criminal activity was afoot, it is "among the relevant contextual considerations in a *Terry* analysis." *Illinois*

*v. Wardlow*, 528 U.S. 119, 124 (2000). "[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Id*. The face-to-face tip from a nearby bystander combined with the locale of events on the night in question are significant factors creating reasonable suspicion in this case.

The final factor tipping the scale in favor of reasonable suspicion, however, is Bandy's flight from Officer Deem and Cpl. Callahan. Cpl. Callahan testified that after he asked Bandy to take his hand out of his pocket, Bandy began dragging the bike away before shoving it to the ground and turning to flee. Bandy sprinted away, climbing over fences and running through alleys and several yards before Cpl. Callahan finally caught up with him. This flight provided Cpl. Callahan with reasonable suspicion to pursue and detain Bandy. Suspicion was increased when Bandy refused to comply with Cpl. Callahan's repeated shouts to "stop." *See U.S. v. Lawshea*, 461 F.3d 857, 859-60 (7th Cir. 2006) (defendant's flight from an officer in a high-crime area just before midnight gave the officer reasonable suspicion to stop defendant). As the Supreme Court stated in *Wardlow*:

> [U]nprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go

> about his business or to stay put and remain
> silent in the face of police questioning.

*Wardlow*, 528 U.S. at 125. Bandy's headlong flight after being approached by police officers epitomizes nervous, evasive behavior and, combined with the factors above, provided Cpl. Callahan with reasonable suspicion to conduct a proper *Terry* stop.

Probable Cause to Arrest Bandy

Additionally, even if Cpl. Callahan had only reasonable suspicion to detain Bandy initially, once he caught up with him after Bandy ignored repeated orders to "stop" and finally fell over a fence near 1700 Arthur Street, Cpl. Callahan had probable cause to arrest Bandy for resisting law enforcement.[4] Bandy subsequently refused Cpl. Callahan's order to place his hands out so that he could be handcuffed behind his back. He continued to struggle, and was only properly handcuffed when Officer Deem and several other officers arrived following Cpl. Callahan's call for backup. Cpl. Callahan and Officer Deem had probable cause to arrest Bandy at that point.

Once lawfully arrested, Bandy was searched again at the Gary Police Department, and his weapon was discovered. Upon reviewing the entire record, the Court is satisfied that the search was conducted pursuant to standard Gary Police Department procedure and

---

[4] Resisting Law Enforcement is a violation under Indiana law. Indiana Code Section 35-44-3-3(a)(3).

was justified and proper.[5]

CONCLUSION

For the reasons set forth above, the Motion to Suppress Evidence as a Result of an Illegal Stop of the Defendant by Gary Police Officers (DE #15) is **DENIED**.

**DATED: October 13, 2009**          **/s/ RUDY LOZANO, Judge**
                                     **United States District Court**

---

[5] In the alternative, the Government also argues that the firearm was admissible under the "inevitable discovery" doctrine because of Bandy's outstanding arrest warrant. The Court need not address this argument as the *Terry* stop and arrest of Bandy were both lawful as set forth above.

-19-